No. 15,939.

AMALGAMATED MEAT CUTTERS AND BUTCHER WORKMEN
OF NORTH AMERICA ET AL. *v.* GREEN, doing business
as S. ADAMS PACKING COMPANY.
(200 P. [2d] 924)

Decided December 6, 1948.   Rehearing denied December 27, 1948.

Mr. PHILIP HORNBEIN, Mr. PHILIP HORNBEIN, JR., for plaintiffs in error.

Mr. F. W. HARDING, MISS ONALEE BROWN, for defendant in error.

*En Banc.*

MR. JUSTICE ALTER delivered the opinion of the court.

GEORGE W. GREEN, doing business as S. Adams Packing Company, brought an action against Amalgamated Meat Cutters and Butcher Workmen of North America, Amalgamated Butcher Workmen of North America, Local 641, A. F. of L., and others, to enjoin defendants from picketing plaintiff's place of business, intimidating plaintiff's employees, representing to plaintiff's customers or others that plaintiff was engaged in unfair labor practices, and attempting to coerce and intimidate plaintiff's employees. Upon hearing before the court, a temporary injunction was issued, to review the proceedings this writ of error was issued.

In the complaint it is alleged that there is not now, nor has there been, any dispute between plaintiff and any of his employees; that on the 20th day of June, 1947, the secretary and business agent of Local Union No. 641, A. F. of L., called upon plaintiff and demanded that he enter into a "closed shop contract" providing that as a condition of employment plaintiff's employees must become members of defendant union, and, in event of their failure so to do, plaintiff would be obligated to employ in their place and stead only members of said union; plaintiff refused to enter into such a contract. It is further alleged that on October 4, 1946, at the request of said union, an election was held under the supervision of the National Labor Relations Board, resulting in a majority of the valid votes being cast against said union, notwithstanding which the secretary and business agent of said union threatened that unless plaintiff complied with his demand for a "closed shop contract," "that he would stop plaintiff's stationary engineer from working," would picket plaintiff's place of business, and thereby prevent deliveries either to or from said place of business. On June 23, 1947, pickets were placed at the entrance to the packing plant and property of plaintiff, which seriously handicapped him

in his business operations by causing pickets to follow drivers while making deliveries of meat; by advising customers of plaintiff that he was using unfair labor practices; by intimidating plaintiff's employees; by intimidating customers, resulting in their refusal to order or pick up deliveries of meat and meat products; by compelling all union food stores and markets and all union businesses connected with the sale of meat and its by-products to refuse to accept plaintiff's products; by using and employing secondary boycotts in connection with said picketing. In addition thereto said union, through its agents and members, has made threats, used coercion, interference, secondary boycotts, and uttered false and fraudulent representations in connection with their efforts to force plaintiff to enter into a closed shop agreement. In such threats, said defendant union, through its officers, agents and members, has stated to plaintiff's employees, that unless they joined said union they would be forever blackballed and refused employment in any packinghouse or like industry.

It further is alleged that the agreement, which said union demanded that plaintiff sign, would require plaintiff to do an unlawful act and compel his employees to join said union or lose their employment; that it unlawfully violates the right of plaintiff to select his own employees; that under it plaintiff would have to coerce his employees to join the union, which would result in an unfair labor practice and be an interference with plaintiff's employees' right to join or refuse to join a labor organization; that said union, through its officers, agents and employees, was, by its proposed contract, demanding that plaintiff violate the provision of chapter 131, S.L. 1943, entitled, "Labor Peace Act."

At the conclusion of all the evidence, the court made certain findings, which are supported by competent evidence, and then entered its judgment and decree. These findings and the judgment are as follows:

"The plaintiff, Mr. Green, on and before October 4,

1946, was the owner of a building in Denver, and operated a slaughtering plant and processed meats and meat products to a certain extent. One Hoffmann, as a lessee of Green, occupied another part of the building and was an important purchaser of meats from Green and carried processing thereof still further than Green did. They both sold meats to others. These parties were not operating as a unit. Each hired his own help and paid that help and managed his own affairs.

"The plaintiff Green on October 4, 1946, had twelve or thirteen employees. His employees were not organized in a collective bargaining unit. Upon that date an election was held at Green's plant, which was operating as the Adams Packing Company, for the purpose of voting upon unionization of the plant. Ten votes were cast, eight of which were against participation in labor organization and two favored unionization and selection of Amalgamated Butcher Workmen of North America, Local No. 641, A. F. of L. Plaintiff's Exhibit A is a tally of the ballots of the election held under the auspices of the National Labor Relations Board, and Plaintiff's Exhibit B is a certificate of the results of that election. The election having failed, the plaintiff employer was not obliged to submit to another election until the expiration of a year.

"The plaintiff during the time since the election, at least, has expanded his operations with meat, and the operations of the lessee Hoffmann have correspondingly diminished. Hoffmann's business was unionized, as is manifested by the contract which is in evidence as Defendants' Exhibit 1. [Article 17 in Defendants' Exhibit 1 reads: The parties hereto agree that at any time during the life of this agreement that should Hoffman Meat Company discontinue business or be forced out of business because of cancellation of their lease with the Adams Packing Co., this contract shall become null and void.]

"About the last of January, 1947, the lease under

which Hoffmann held a part of the building was terminated by the acts of Hoffmann and Green, and thereafter Hoffmann continued to hold for a time on a month to month basis as a tenant at will. Still later in the year 1947 Hoffmann's business diminished further, and on June 20 he dismissed his employees and paid them, and himself began working for Green or with Green upon some sort of a commission or markup basis, in which his own services and that of his two daughters appeared to have sufficed.

"On June 20 the plaintiff Green was visited by one of the defendants, E. B. Richardson, personally, and as Secretary and Business Agent of the Amalgamated Butcher Workmen of North America, Local No. 641, A. F. of L., demanding that the plaintiff sign a closed shop contract or a union contract, whatever it was, and that plaintiff's employees should become members of the defendant union, and requiring the plaintiff to employ only union men. The plaintiff refused to sign the contract, his own plant being operated on a non-union basis by virtue of the aforementioned election.

"There was no labor dispute at any time between the plaintiff Green and his employees, as a labor dispute is defined in the Act of 1943, nor has any such dispute arisen between them since that date.

"A few days after the refusal of Green to sign the union contract the defendants established a picket line at the premises, over which Green's customers would not cross, because many of them were union affiliated concerns and individuals. The defendant Richardson protested the handling of products coming from Green's establishment by certain other concerns employing union labor. The Teamsters Union refused transportation of Green's products, compelling Green himself to find means and transporting his own products to such customers as were still willing to receive them.

"A colored man by the name of John Brown for one of the concerns with which Green had been dealing went

to the place to get a quantity of hides, and was commanded by the picketers not to take the hides, whereupon he abandoned his attempt to transport the hides to the purchasers or processor.

"The evidence further shows and the Court finds that the defendants or one or more of them would follow the vehicles transporting products from the plaintiff's establishment to places where he delivered or attempted to deliver the same, and protested the unfairness of Green's packing company to those customers, with the result that the plaintiff suffered delays and failures and many inconveniences in attempting to carry on his business, all to his great irreparable damage and injury, and that he is still suffering losses and inconveniences and injuries, and will continue to suffer such losses as long as the existence of said picket line and the aforementioned practices is permitted to continue.

"It appears further from the evidence and the Court finds that the pickets who are complaining are not the employees of the plaintiff, but all or some of them are the discharged employees of Hoffmann, who no longer employs labor.

"The picket line which has been established and the other practices hereinabove enumerated are unlawful and wrongful in that they are not based upon any labor dispute.

"It is stoutly argued by the defendants that there was something sham or fraudulent or deceitful about the relation between the plaintiff Green and the man Hoffmann who was an employer of labor prior to June 20, but the evidence fails to show any fraud, deceit or sham, and fraudulent practices may not rest upon a presumption unsupported by substantial evidence of the fact itself.

"And upon reading the complaint and hearing and considering the testimony offered and received not only upon the part of the plaintiff but of the defendants, and

after hearing and considering all of the arguments of counsel,

· "The Court finds that this is a proper case for a restraining order, and that sufficient grounds exist therefor, and that as a condition to the granting of said order the plaintiff be required to give a good and sufficient bond as required by law, in the penal sum of one thousand dollars.

"The Court further finds that the plaintiff, George W. Green doing business as S. Adams Packing Company is operating entirely within the State of Colorado and is not operating interstate.

"And now the plaintiff having made and filed the necessary and proper undertaking as herein required:

"It is therefore ordered by the Court

"That until the further order of the Court the defendants and each of them and every one of them and their and each of their servants, agents, attorneys, employees and all persons acting under the control, authority or direction of them or any of them do absolutely refrain from and desist from:

"1. In any manner establishing and maintaining a secondary boycott against the products of the plaintiff George W. Green doing business as S. Adams Packing Company at any of the Piggly Wiggly stores in Denver, Colorado, or at any other store or stores in Colorado which purchase the products of the said George W. Green doing business as S. Adams Packing Company for resale to its own customers.

"2. In any manner establishing, maintaining or continuing to maintain pickets against or about the products of the said George W. Green doing business as S. Adams Packing Company at or about any of said stores or about the premises of the said George W. Green doing business as S. Adams Packing Company.

"3. In any manner interfering with the delivery of the products of said company to said Piggly Wiggly stores or the Capitol Rendering Works or any other

person, firm or corporation who utilizes any by-products, edible or inedible of the packing plant of the plaintiff, George W. Green, doing business as S. Adams Packing Company.

"4. In any manner intimidating or otherwise preventing the transportation of any of said products by the Teamsters Union or by any other person, firm or corporation available and otherwise willing to transport the same.

"That from the evidence it is made to appear that the plaintiff's injury consists of a substantial loss of his business and profits therefrom, and that said losses are likely to continue so long as said picketing, publication, secondary boycott and other practices are permitted; that the nature of plaintiff's product is perishable, and he is likely to sustain further irreparable and permanent losses thereof shall his ability to freely market the same remain impaired by the practices enumerated, and that said practices are likely to result in the total loss of the plaintiff's business if permitted to continue; and that said practices have been wrongfully indulged in, not as a result of a labor dispute as defined by law, but as a means to coerce the plaintiff into making a union contract in derrogation and destruction of the rights of his non-union employees, manifested by their free election of October 4, 1946."

The specification of points upon which the union relies for a reversal herein are, that the court erred: 1. In finding and determining that there was no labor dispute within the meaning of the Colorado Labor Peace Act; 2. in issuing its injunction; 3. in determining that a secondary boycott existed; 4. in enjoining defendants from intimidating or otherwise preventing transportation of plaintiff's product; 5. in holding that the Colorado Labor Peace Act was constitutional, particularly respecting sections 2 (7) and 6 (2) thereof.

The first and primary question for our determination is whether a "labor dispute" existed under the

facts as found by the trial court which were based upon, and supported by, competent and material evidence. In section 2 (7), chapter 131, page 395, S.L. 1943, a "labor dispute" is defined as follows:

"The term 'labor dispute' means any controversy *between an employer and such of his employees as are organized in a collective bargaining unit,* concerning the rights or process or details of collective bargaining. The entering into of a contract for an 'all-union agreement' or the refusal of an employer to enter into an 'all-union agreement' shall not constitute a labor dispute. *It shall not be a labor dispute where the disputants do not stand in the proximate relation of employer and employee.* No jurisdictional dispute or controversy between two or more unions as to which of them has or shall have jurisdiction over certain kinds of work; or as to which of two or more bargaining units constitute the collective bargaining unit as to which the employer stands impartial or ready to negotiate or bargain with whichever is legally determined to be such bargaining unit, shall constitute a labor dispute.

"The general right of an employer to select his own employees is recognized and shall be fully protected. * * * (Italics ours.)

The undisputed evidence here is that the Hoffmann Meat Company, by J. E. Hoffmann, had entered into a contract with the union here involved, which contract is before us in the record. Article 17 of that contract provides: "The parties hereto agree that at any time during the life of this agreement that should Hoffmann Meat Company [Joe E. Hoffmann] discontinue business or be forced out of business because of cancellation of their lease with the Adams Packing Co. [George W. Green], *this contract shall become null and void."* (Italics ours.) The undisputed evidence is that the Hoffmann Meat Company did "discontinue business" or was "forced out of business" because of the cancellation of their lease with the Adams Packing Company, and,

consequently, the contract by its express terms became null and void, and when the secretary and business agent of the union demanded an election on behalf of those whom he represented who were formerly employees of Hoffmann, he was acting on an erroneous assumption, because there was no contract upon which to base his representation. The court specifically found, and there was competent evidence to support its finding, that "there was no labor dispute at any time between the plaintiff Green and his employees." This must be admitted unless it is found that a conspiracy existed between Green and Hoffmann, the object of which was to avoid the union contract. On this point there was no evidence to support any such a finding or conclusion. The former employees of Hoffmann were discharged by him, and never became employees of Green, and at the time of the execution of the contract between the union and Hoffmann there must have been in contemplation a situation where Hoffmann would discontinue his business because such a contingency is anticipated in the contract and, upon the happening of this contingency, the contract was to become null and void.

It was the demand of the secretary and business agent of the union requiring Green to recognize Hoffmann's employees as his employees and execute a union contract which gave rise to this controversy. The secretary and business agent demanded that Green consent to an election at which the employees of Hoffmann, as well as his own, might be accorded the rights of voting, notwithstanding the fact that on October 4, 1946, Green's employees had expressly voted against union representation. It seems to be conceded that no other election could be forced upon Green's employees until the expiration of one year from that date.

The court found, and its findings are supported by competent evidence, that the former employees of Hoffmann were not employees of Green, and we are now called upon to determine whether a "labor dispute," as

defined in section 2 (7), supra, existed. It is here claimed, as was contended in *Denver Milk Producers, Inc. v. International Brotherhood of Teamsters, etc.,* 116 Colo. 389, 183 P. (2d) 529, that the definition of a "labor dispute" contained in section 2 (7) is too narrow, and with reference thereto we said:

"To reach a proper conclusion on the above question [the narrowness of the legislative definition of a labor dispute], section 16 of the act must be considered with said paragraph 7 of section 2. When so considered and taken together, those sections mean that courts of Colorado are divested of all jurisdiction to grant restraining orders or injunctions which prohibit any person from doing certain specific things therein mentioned 'in any case involving or growing out of a "labor dispute," as herein defined.'

"In the absence of any statute on the subject there is no restriction on the courts in granting restraining orders or injunctions in any case. It is only in cases involving 'labor disputes' that the court does not have jurisdiction to grant such orders. The statute does not take away any right from defendants, but bestows upon them additional rights in 'labor disputes' not theretofore possessed. It creates a defense in labor disputes against actions for restraining orders and injunctions not permitted in other disputes. The gist of the defendants' argument is that the statute is void and unconstitutional because it is not more generous. The same argument could be advanced against the Workmen's Compensation Act of Colorado because it allows fourteen dollars a week for temporary total disability instead of awarding a larger sum. There is no constitutional right to have an act passed by the legislature divesting courts of jurisdiction in specific cases and no one has a constitutional right to a repeal of said act. The legislature created the defense and by the same token can take it away. If the act is held invalid, as defendants ask, the statutory defenses permitted in labor disputes would be eliminated

and such controversies controlled by the general rules of this court as in other cases. That is not what the defendants really want. They seek to have the definition of 'labor dispute,' so liberalized as to include a larger field wherein no injunction may issue. Naturally we have no power or authority to legislate upon the subject and such arguments should be addressed to the general assembly and not to this court."

Assuming that the legislature has the power and authority to restrict judicial officers in exercising their prerogative respecting the issuance of injunctions in any action, it will be noted that section 16, chapter 131, page 411, S.L. 1943, only attempts that restriction to *"any case involving or growing out of a labor dispute, as herein defined,"* and thereafter specifically enumerates the acts which may not be enjoined when a labor dispute is involved. Having in mind the provisions of said section 16, and still assuming the authority, we find the legislature prohibiting the court from granting injunctive relief in certain specific instances where a "labor dispute" is established, but not attempting, however, to entirely deprive courts of injunctive relief in other cases, and in connection therewith we said in *Milk Producers v. Brotherhood, supra*:

"By the act above mentioned [sec. 16, c. 131, p. 411, S.L. 1943], the court is prohibited from restraining the commission of eleven separate and distinct acts 'in any case involving or growing out of a labor dispute, as herein defined * * *.' There is no prohibition against restraining those same acts in any other kind of a dispute, and no proscription against restraining the commission of acts even in a *labor dispute* other than those acts expressly set forth in the statute.

"Is this a '*case involving or growing out of a labor dispute*'? The answer, of course, must be found in the application of the legislative definition, supra.

"The definition may be considered as consisting of two

propositions: (1) What *is* a labor dispute; and (2) What *is not* a labor dispute.

"[1] What *is* a labor dispute may be defined in substance to mean:

"1. 'Any controversy between employer and such of his employees as are organized in a collective bargaining unit, *concerning the rights or process or details of collective bargaining*';

"2. The refusal to employ or the discharge of an employee when such is founded upon membership in a union or labor organization or activity or where such discharge or failure to employ is in violation of a contract.

"What *is not* a labor dispute can be said in substance to be:

"1. Entering into or refusing to enter into an 'all-union agreement';

"2. Where the disputants do not bear the relationship of employee and employer;

"3. Jurisdictional disputes between unions;

"4. Disputes as to with which of two or more rival bargaining units the employer must negotiate, where employer is willing to negotiate with whichever is legally determined to be the bargaining unit;

"5. Refusal to employ or the discharge of an employee on account of incompetence, neglect of work, unsatisfactory service, or dishonesty;

"6. Any controversy between an employer and such of his employees as are organized in a collective bargaining unit, which does not concern 'the rights or process or details of collective bargaining.'

\* \* \*

"The conclusion is inescapable, and we so hold, that the Colorado Labor Peace Act, in so far as applicable here, is in all respects constitutional, valid and enforceable, and that this is not a case 'involving or growing out of a labor dispute' as defined in the act. We also hold that there is no merit to the contentions of the de-

fendants in error that their constitutional rights under the First, Thirteenth, and Fourteenth Amendments to the Federal Constitution will be violated, if the injunction is made permanent."

As we construe our decision in the Milk Producers case, and particularly the portions thereof hereinabove quoted, the evidence in the present litigation clearly establishes that *there was no "labor dispute" between Green and his employees concerning the rights or process or details of collective bargaining;* consequently, there is no legislative attempt to restrain the court from a proper exercise of its injunctive prerogatives.

It apparently is conceded, as we have said, that Green's employees, having voted against union representation as their bargaining agent on October 4, 1946, no other election could be forced upon them until a year had elapsed. From aught that appears in the record, Green's employees were content with their status. No dispute concerning hours, wages, working conditions or any other matter incident to their employment had arisen between them and their employer. The secretary, who was the business agent of the union, was demanding that Green enter into an all-union contract. If Green had consented to and executed such a contract, the result would have been that those of Green's employees who had expressly indicated a desire not to have union representation would have been forced to join the union and accept the union as their bargaining agent or be discharged. If Green had consented to an election at which Hoffmann's former employees in the number of about seventeen were permitted to vote with Green's ten employees, the inevitable effect might well have been that a majority would have cast their votes for union representation, with the result above noted. If, under the conditions here, Green had signed the contract which the secretary and business agent of the union was insisting should be executed by him, he would have been guilty of a violation of section 6 (1) (a), and section

6 (1) (c), and section 6 (1) (3), of the Labor Peace Act, and his action would have constituted an unfair "labor dispute," for which he would have been amenable in civil and criminal actions.

We conclude that there is herein no evidence of a "labor dispute," as that term is defined in section 2 (7) of the Colorado Labor Peace Act; that the definition of a "labor dispute" therein contained is sufficiently comprehensive and is not violative of federal and state constitutional provisions. No "labor dispute" existing, it follows that the legislature has not attempted to restrict courts in the issuance of injunctions under the circumstances of this case. There is competent evidence in the record to support the court's findings of fact and award of the injunctive relief granted.

Accordingly, the judgment is affirmed.

MR. JUSTICE HILLIARD dissents.

MR. JUSTICE STONE does not participate.